**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL PUBLIC RADIO, INC.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES AGENCY FOR GLOBAL MEDIA**, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-02965 (TNM) |

**MEMORANDUM OPINION**

This Freedom of Information Act dispute stems from cutbacks at an agency. An executive order directed the U.S. Agency for Global Media to reduce operations and to send a report confirming compliance to the Office of Management and Budget. Shortly after the report's submission, National Public Radio and one of its journalists submitted a FOIA request for it. The agencies released only a redacted version, and the parties now cross-move for summary judgment over those redactions' propriety. Because the redactions are justified under the deliberative process privilege and fulfill FOIA's other requirements, the Court will grant summary judgment for the agencies.

**I.**

Two months into his second term, President Trump issued an executive order on "Continuing the Reduction of the Federal Bureaucracy." Exec. Order 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025). That order directed seven "governmental entities," including the U.S. Agency for Global Media ("the Agency"), to eliminate their "non-statutory components and functions" and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* at 13043. The President also

demanded that the head of each targeted entity submit, within seven days of the order's issuance, "a report to the Director of the Office of Management and Budget ['OMB'] confirming full compliance with th[e] order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* The Agency followed the President's deadline and submitted a report on March 21, 2025 ("the Report"). Caglioti Decl., ECF No. 23-3, ¶ 7.

Ten days later, the Agency received a FOIA request from David Folkenflik, a reporter for National Public Radio. *Id.* ¶ 3. That request sought both the Report and "[a]ll attachments to, and all records, reports or other documents referred to in, or incorporated by reference into, the Report." Agency FOIA Request, ECF No. 1-4, at 2. OMB received the same request. OMB FOIA Request, ECF No. 1-5. After neither the Agency nor OMB granted the request, National Public Radio and Folkenflik (collectively, "NPR") sued them here. Compl., ECF No. 1, ¶¶ 7–8. NPR's FOIA action seeks "to enjoin [the Agency] and OMB from improperly withholding" the Report "and accompanying documents." *Id.* ¶ 9.

Some months into the lawsuit, the Agency and OMB (collectively, "the Government") released "12 pages of documents with some redactions under Exemption 6." 2d JSR, ECF No. 20, at 2. As for the Report itself, the Government initially decided to withhold it "in full pursuant to Exemption 5 and the deliberative process privilege." Caglioti Decl. ¶ 9. It later revised that determination, "partially grant[ing] the request and releas[ing] the [R]eport in part, with limited portions withheld pursuant to FOIA Exemption 5." *Id.* ¶ 10; *see* Redacted Report, ECF No. 23-6.

The parties now cross-move for summary judgment. Their dispute centers solely on the Government's assertion of Exemption 5 to redact portions of the Report. *See* Defs.' Mot. Summ.

J., ECF No. 23, at 9–15; Pls.' Cross-Mot. Summ. J., ECF No. 24-1, at 9–18. Upon the Court's order, the Government produced the unredacted Report for *in camera* review. *See* Notice of Compliance, ECF No. 29. The parties' cross-motions are ripe for this Court's decision.

**II.**

"The vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011) (cleaned up). To obtain summary judgment, the movant must show that "there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court credits the nonmovant's factual allegations and draws all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"FOIA mandates the disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (citing 5 U.S.C. § 552(b)). An agency claiming a FOIA exemption must establish that it applies to the withheld information. *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). That burden remains on the agency "[e]ven when the requester files a motion for summary judgment." *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999). The agency can carry its burden by submitting a declaration that "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018) (cleaned up).

A 2016 amendment adds another wrinkle. Even if an exemption applies, the information must still be released unless the agency shows that disclosure would cause "reasonably

foreseeable harm to an interest that the exemption protects." *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024); *see* 5 U.S.C. § 552(a)(8)(A)(i). "More, an agency must release any segregable portions of a record that is otherwise exempt, typically by proceeding 'line-by-line.'" *Ctr. for Immigr. Stud. v. USCIS*, 766 F. Supp. 3d 1, 7 (D.D.C. 2025) (quoting *Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021)); *see* 5 U.S.C. § 552(b).

**III.**

The parties' dispute here is narrow. They quarrel over one document and one exemption. The Government justifies its redactions to the Report by invoking Exemption 5 and the deliberative process privilege. Defs.' Mot. Summ. J. at 9. NPR counters that "[t]he redacted portions of the Report are not protected" from disclosure. Pls.' Cross-Mot. Summ. J. at 9. Having considered the parties' submissions and reviewed the unredacted Report *in camera*, the Court agrees with the Government that the deliberative process privilege applies. Because the Government has also shown foreseeable harm and that it released all nonsegregable material, the Court will grant it summary judgment.

FOIA Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges available to Government agencies in civil litigation," including "the deliberative process privilege." *Sierra Club*, 592 U.S. at 267.

The deliberative process privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (cleaned up). In other words, it shields "documents generated during an agency's

deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts." *Sierra Club*, 592 U.S. at 263. By "protect[ing] agencies from being forced to operate in a fishbowl," the privilege "encourage[s] candor, which improves agency decisionmaking." *Id.* at 267 (cleaned up).

"To fall within the privilege, a document must be predecisional and deliberative." *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). "Documents are predecisional if they were generated before the agency's final decision on the matter." *Sierra Club*, 592 U.S. at 268 (cleaned up). "[T]hey are deliberative if they were prepared to help the agency formulate its position," *id.* (cleaned up), or if they "reflect[] the give-and-take of the consultative process," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *Sierra Club*, 592 U.S. at 268.

Against that backdrop, consider the disputed redactions. The Report is a three-page document. Redacted Report at 2–4. The first one and a half pages are largely unredacted and describe some of the "aggressive and immediate steps" that the Agency took "to comply with the Executive Order." *Id.* at 2. The document reports, for example, that "[t]ermination letters were sent to [the Agency's] grantees" and that the Agency "ordered grant recipients to cease making any payments to carry out the grant agreement with [the Agency] effective March 15, 2025." *Id.* Under the heading of "Domestic Operations," the Agency announces that it "placed 994 out of 1,147 federal employees on administrative leave," "immediately stopped all relevant news-gathering functions," and "shut down relevant radio transmissions." *Id.* at 2–3. Only one sentence under that heading is redacted; it follows right after the Agency's statement that it "began [its] formal engagement with [the] Office of Personnel Management to allow for

expeditious Reduction in Force." *Id.* at 2. The Agency's description of "Overseas Operations" is also unredacted, and it details how the Agency "shut off radio transmissions" in various countries. *Id.* at 3.

The remaining one and a half pages are redacted. *Id.* at 3–4. They fall into two sections: one under the partially redacted heading "Proposed . . ." and the other under the heading "Future State." *Id.*

In explaining the redactions, the Government states that "[t]he withheld portions of [the] [R]eport lacked any immediate force or effect." Schmitt Decl., ECF No. 23-4, ¶ 12. According to the Government, the redactions conceal "proposals and recommendations on workforce restructuring and organizational realignment," which "were meant to be part of an iterative review process with OMB and other agencies." *Id.* "This iterative process is also evidenced in [the Agency's] update to OMB in mid-April 2025 when it emphasized the need to conduct further review and evaluation in order to develop sustainable long-term workforce solutions that align with the Administration's priorities." *Id.* As the Government sees it, the Report "reflects a snapshot in an evolving process and not a final or settled agency action." *Id.* And "[t]o the extent [the] [R]eport contained background information or listed actions already taken in response to EO 14238," the Government says that it "released" those parts. *Id.* ¶ 13.

The Report's redactions satisfy both prongs of the deliberative process privilege. The redacted portions are predecisional because "they were generated before the [A]gency's final decision on" the operational reductions that it proposed to OMB. *See Sierra Club*, 592 U.S. at 268 (cleaned up). And the redacted bullets are deliberative because they "reflect[] the give-and-take of the consultative process" between the Agency and OMB. *See Coastal States Gas Corp.*, 617 F.2d at 866; *see also, e.g.*, *James Madison Project v. DOJ*, 436 F. Supp. 3d 195, 204

(D.D.C. 2020) (holding that privilege applied to "crime reports from the CIA to DOJ, which contain[ed] the CIA's position and recommendation with respect to a possible criminal investigation or prosecution"). That finding is bolstered by the Court's *in camera* review of the unredacted Report. *See Hooker v. HHS*, 887 F. Supp. 2d 40, 58 (D.D.C. 2012), *aff'd*, No. 13-5280, 2014 WL 3014213 (D.C. Cir. May 13, 2014). Unlike the unredacted portions, which describe actions taken, the redactions discuss future options and explicitly envision further deliberation before execution.

Resisting that conclusion, NPR contends that the Report "merely documents [the] [A]gency's compliance with a presidential directive." Pls.' Cross-Mot. Summ. J. at 5. NPR parses the executive order, which in its reading required the Agency "to confirm 'full compliance' with it—not to advise on what policy should be." *Id.* at 10. It points out that the Agency "had already placed over 1,000 journalists and staff on administrative leave, terminated hundreds of contractors, and canceled all grants" before the Report's submission. *Id.* The flaw in NPR's argument is that those actions are already unredacted. *See* Redacted Report at 2–3. NPR fails to show how the executive order's requirement that the Report confirm compliance contradicts the Government's statements that the Report also makes forward-looking proposals. In other words, the Report's partial redactions already distinguish between completed actions that must be released and proposed actions that may be withheld. NPR does not persuade the Court to redraw that line.

Taking a different tack, NPR asserts that "[e]ven if portions of the Report were predecisional when first drafted, the Report has since lost whatever deliberative process protection it may have once enjoyed." Pls.' Cross-Mot. Summ. J. at 13. As evidence, NPR points to deposition testimony in another case from Kari Lake, the Agency's senior advisor, who

stated that "the document reflected a 'recommendation guideline so that we can go forward and effectuate the continuing reduction of the federal bureaucracy executive order.'" *Id.* at 14 (quoting Lake Depo. Tr., ECF No. 24-3, at 151:19–22). NPR also gestures toward a June 2025 Congressional Notification that "described the same statutory minimum plan in granular detail." *Id.* (citing Congressional Notification, ECF No. 24-7). According to NPR, this evidence of later adoption wholly strips the Report of its predecisional and deliberative status. *Id.* at 14–15.

That argument falls short. To be sure, "even if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 866. But "[t]o adopt a deliberative document, it is not enough for an agency to make vague or equivocal statements implying that a position presented in a deliberative document has merit; instead, the agency must make an *express* choice to use a deliberative document as a source of agency guidance." *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (cleaned up). Even the agency's "carr[ying] out the recommended decision" does not automatically mean "that the [document] accurately reflected the decisionmaker's thinking." *Afshar v. Dep't of State*, 702 F.2d 1125, 1143 n.22 (D.C. Cir. 1983). "Instead, there must be concrete evidence that the policymaker relied on a document's analysis and incorporated it by reference into his final decision." *Ctr. for Immigr. Stud.*, 766 F. Supp. 3d at 9.

NPR's evidence does not cut the mustard. Neither Lake's deposition testimony nor the Congressional Notification shows that the Agency carried out the Report's redacted proposals, let alone that the Agency expressly adopted the Report's recommendations. Indeed, both sources reaffirm the evolving character of the Agency's decisionmaking. In another exchange during the deposition, Lake agreed that she "underst[ood] that after [the Report] was issued, someone had to

evaluate it and decide whether to accept or reject the recommendation." Lake Depo. Tr. at 152:11–19. More than two months after the Report's submission, meanwhile, the Congressional Notification stated that "the plan to effectuate the President's Executive Order [wa]s still developing." Congressional Notification at 1. All told, NPR fails to show that the Report's redacted portions lost their predecisional and deliberative character. *See Shapiro*, 893 F.3d at 799. The Court holds that the deliberative process privilege applies.

Next take foreseeable harm. On this front, the Government explains that "[d]isclosure of the proposals and plans contained in [the] [R]eport . . . would not only reveal the [A]gency's internal prioritization and preliminary recommendations, but also how and why the [A]gency weighed competing options." Schmitt Decl. ¶ 14. It would also hamper OMB's "deliberative process" by "chill[ing] frank and honest dialogue." *Id.* According to the Government, "[t]his harm is especially acute here because successful implementation of the [executive order] depends in large part on OMB ensuring that agencies align their actions and policies with Administration priorities rather than operating in isolation." *Id.* Those concerns are compounded by the fact that certain of the redacted recommendations "could be publicly unpopular" given that the Agency "oversees a number of well-known public service media networks, such as Voice of America and Radio Free Europe/Radio Liberty, and its [R]eport contains short- and long-term proposals concerning the future of these networks." *Id.* ¶ 15.

The Government successfully "provide[s] a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede the interests protected by a FOIA exemption." *See Leopold*, 94 F.4th at 37 (cleaned up). The harm it describes is specific to the Report's redactions and invokes the very interests that the deliberative process privilege promotes. *See Sierra Club*, 592 U.S. at

267 (recognizing the privilege's function in "protect[ing] agencies from being forced to operate in a fishbowl" and "encourag[ing] candor, which improves agency decisionmaking" (cleaned up)); *see also Ctr. for Immigr. Stud.*, 766 F. Supp. 3d at 12 (holding that the agency's "rationale f[ell] squarely within the interests the exemption was designed to protect: frank communication within the agency without fear of public reprisal").

That still leaves segregability. The Government attests that it "conducted a line-by-line review of [the] [R]eport to assess whether any reasonably segregable, non-exempt information can be released," "evaluat[ing] each bulleted point on every line to determine whether factual material could be meaningfully separated from deliberative content." Schmitt Decl. ¶ 17. Based on this review, the Government "concluded that there is no additional information that could be segregated and released without causing foreseeable harm." *Id.*

That declaration suffices. "When an agency conducts such a line-by-line review, it is 'entitled to a presumption that [it] complied with [its] obligation' to release segregable material." *Ctr. for Immigr. Stud.*, 766 F. Supp. 3d at 12 (quoting *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007)); *see also Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("The combination of the *Vaughn* index and [agency affidavits] [is] sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated." (cleaned up)). That presumption is confirmed by the Court's *in camera* review of the unredacted Report, which satisfies the Court that the Government "has released all reasonably segregable portions of the document." *See Ctr. for Immigr. Stud.*, 766 F. Supp. 3d at 12.

**IV.**

The Government properly justifies the Report's redactions under Exemption 5 and the deliberative process privilege. It also prevails on foreseeable harm and segregability. For these reasons, the Court will grant summary judgment for the Government. A separate Order will issue.

Dated: August 21, 2026

TREVOR N. McFADDEN
United States District Judge